IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 6, 2008 Session

## TIMMY SYKES ET AL. v. CHATTANOOGA HOUSING AUTHORITY ET AL.

Appeal from the Circuit Court for Hamilton County
No. 05C556      W. Jeffrey Hollingsworth, Judge

No. E2008-00525-COA-R3-CV - FILED JULY 31, 2009

This opinion replaces one filed on March 31, 2009, which opinion was withdrawn by us "and held for naught" by order of April 21, 2009. The joint complaint filed by the plaintiffs, Timmy Sykes and Curtis Greene, who are African-Americans, actually involves the independent claims of the two plaintiffs against their former employer, the Chattanooga Housing Authority ("the CHA" or "CHA"), and the plaintiffs' supervisor in that employment, Jeff Hazelwood, Chief of the CHA's Public Safety Department, for wrongful termination of their employment and other claims. Sykes, who was a CHA criminal investigator, was terminated by the CHA on September 30, 2004, and Greene, also a criminal investigator, was terminated on January 19, 2005. They each seek damages for wrongful termination, asserting two theories of recovery. Sykes also seeks damages from Chief Hazelwood for alleged defamatory statements made by him and both plaintiffs sue Hazelwood for interfering with their CHA employment. The defendants filed a motion for summary judgment which the trial court granted as to all claims. The plaintiffs appeal. They raise three issues in common and Sykes complains of the trial court's judgment with respect to his defamation claim. We affirm in part and vacate in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed in Part and Vacated in Part; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Michael A. Anderson, Chattanooga, Tennessee, for the appellants, Timmy Sykes and Curtis Greene.

Stacie L. Caraway and Larry L. Cash, Chattanooga, Tennessee, for the appellees, Chattanooga Housing Authority and Jeff Hazelwood.

**OPINION**

I.

As pertinent to the issues on this appeal, the complaint sets forth four theories of recovery, three of which are common to both plaintiffs, and one that applies only to the plaintiff Sykes. Each of the plaintiffs sues the CHA for retaliatory discharge under Tenn. Code Ann. § 50-1-304 (2008), commonly known as the Tennessee Whistleblower Act. They allege that they were terminated because they reported illegal conduct by the CHA. They also sue under Tenn. Code Ann. § 4-21-301 (2005), the Tennessee Human Rights Act ("the THRA"), for damages arising out of their terminations, which, they allege, were in retaliation for their having opposed practices of racial discrimination. Both plaintiffs sue Chief Hazelwood, alleging he intentionally interfered with their contracts of employment with the CHA. Finally, Sykes sues Chief Hazelwood, claiming that the chief defamed him. Based upon the "papers" filed in this case by the defendants and the plaintiffs, the trial court found an absence of any genuine issues of material fact with respect to all claims. The court concluded that the material facts before it conclusively showed that the defendants are entitled to summary judgment.

II.

In their joint brief, the plaintiffs raise four issues that essentially pose four questions:

> Are there genuine issues of material fact as to whether Chief Hazelwood made defamatory statements about Sykes?
>
> Are there genuine issues of material fact precluding summary judgment as to the independent claims of Sykes and Greene that Chief Hazelwood intentionally interfered with his contract of employment with the CHA?
>
> Are there genuine issues of material fact with respect to the independent claims of Sykes and Greene that the CHA terminated his employment in retaliation for his complaints about illegal activities by the CHA, said retaliation allegedly being in violation of the Tennessee Whistleblower Act?
>
> Are there genuine issues of material fact as to whether the CHA terminated Sykes and Greene in violation of the THRA?

III.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04.

-2-

To decide whether a genuine issue of material fact exists, courts "must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Byrd v. Hall*, 847 S.W.2d 208, 210-11 (Tenn. 1993) (citations omitted). Then, if any disagreement remains as to "any material fact or any doubt as to the conclusions to be drawn from that fact, the motion must be denied." *Id.* at 211 (citation omitted). When reviewing a motion for summary judgment, "[t]he court is not to 'weigh' the evidence." *Id.* "The phrase 'genuine issue' contained in [Tenn. R. Civ. P.] 56.03 refers to genuine factual issues and does not include issues involving legal conclusions to be drawn from the facts." *Id.* "The critical focus is limited to facts deemed 'material,' which is to say those facts that must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Id.* (citation omitted). In appellate review of a grant of summary judgment, there is no presumption of correctness accorded to the trial court's determination. *Eyring v. Fort Sanders Parkwest Med. Ctr., Inc.*, 991 S.W.2d 230, 236 (Tenn. 1999). The only evidence that can be considered in the summary judgment analysis is evidence that would be admissible at trial; but a court can consider evidence that is not in admissible form, *e.g.*, affidavits. *Byrd* at 215-16.

In *Hannan v. Alltel Publishing Co.,* 270 S.W.3d 1 (Tenn. 2008), the Tennessee Supreme Court recently addressed the burden shifting analysis in summary judgment cases:

> Summary judgment is appropriate when the moving party can show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Byrd v. Hall,* 847 S.W.2d 208, 214 (Tenn. 1993). In *Byrd,* this Court set out the basic principles involved in determining whether a motion for summary judgment should be granted. The moving party has the ultimate burden of persuading the court that "there are no disputed material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." *Byrd*, 847 S.W.2d at 215. If the moving party makes a properly supported motion, the burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists. *Id.* To meet its burden of production and shift the burden to the nonmoving party, the moving party must either affirmatively negate an essential element of the nonmoving party's claim or establish an affirmative defense. *Id.* at 215 n.5. If the moving party does not satisfy its initial burden of production, the court should dismiss the motion for summary judgment. *See id.* at 215. Summary judgment should be granted only when, with the facts viewed in favor of the nonmoving party, it is clear that no genuine issue of material fact exists. *Id.* at 210-11.

*Hannan*, 270 S.W.3d at 5. The High Court went on to state what a moving party must show, in general terms, to trigger the plaintiff's obligation to produce facts creating a genuine issue of material fact:

> [I]n Tennessee, a moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial.

*Id*. at 8-9. As indicated in ***Hannan***, a defendant may also trigger the plaintiff's obligation by presenting facts establishing an affirmative defense. ***Hannan***, 270 S.W.3d at 5.

In the present case the parties rely almost exclusively on federal cases applying Tennessee substantive law and federal procedural law. It is very significant to note that the Tennessee Supreme Court has explicitly stated that, for summary judgment motions, "a moving party's burden of production in Tennessee differs from the federal burden." ***Hannan***, 270 S.W.3d at 8. This distinction is not new, as the High Court noted in ***Hannan***: "Our discussion shows that in ***Byrd***, despite language suggesting the contrary, we began our departure from the federal standard and continued that departure in ***McCarley***, and in subsequent cases." *Id.* at 6. According to Chief Justice Holder, "It is not enough for the moving party to challenge the nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial. Nor has our Court ever followed the standard . . . that the moving party may simply show that the nonmoving party 'lacks evidence to prove an essential element of its claim.' " *Id.* at 8.

In ***McCarley v. West Quality Food Serv.***, 960 S.W.2d 585 (Tenn. 1998), the Supreme Court, again speaking through Justice Holder, had emphasized the mechanics of the ***Byrd*** test, which always requires the moving party to shift the burden of production to the nonmoving party before the nonmoving party is required to show evidentiary support for its cause of action:

> [W]e find that the proper standard and burden shifting analysis applicable to summary judgment dispositions has not been applied [in McCarley]. The [Court of Appeals] acknowledged the moving party's burden of demonstrating the absence of material facts creating genuine issues for trial. The court, however, bypassed the moving parties' initial burden and addressed only the sufficiency of the non-moving parties' opposing evidence. We find that the court erred in focusing on the non-moving parties' burden without first addressing whether the burden was actually triggered.

*Id.* at 587-88.

Thus, in the present case, treating each cause of action for each plaintiff separately, we are charged with determining whether the defendants, as the movants, have set forth facts shifting the burden to the nonmovant plaintiff before we consider whether that particular plaintiff has offered evidence creating a genuine issue of material fact. If the movant is unable to satisfy at least one

-4-

prong of the ***Hannan*** test, the movant's motion for summary judgment is not "properly supported" and must fail due solely to its own deficiency. If, however, the defendants satisfy their burden, the burden of production for a given cause of action shifts to the respective nonmovant, who "must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial." ***Byrd v. Hall***, 847 S.W.2d at 211 (citations omitted). If the respective nonmovant is able to show such acceptable evidence as described in Rule 56.06, the movant's summary judgment motion for that cause of action must be denied. The nonmovant "cannot simply rely upon [its] pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial." ***Id.*** (emphasis in original). If, after the movant successfully shifts the burden of production to the respective nonmovant, the latter fails to provide evidence showing that a genuine issue of material fact exists, summary judgment for that cause of action must be granted. "Then, if there is a dispute as to any material fact or any doubt as to the conclusions to be drawn from that fact, the motion must be denied." ***Id.*** at 211.

IV.

A.

1.

Sykes appeals the trial court's grant of summary judgment as to his cause of action for defamation against Chief Hazelwood.[1] He contends in his amended complaint that Chief Hazelwood defamed him "by making false statements to third persons . . . . intentionally or with reckless disregard for the rights of [Sykes] . . . and such communications constituted a serious threat to the reputation of [Sykes]." Sykes alleges that he has "incurred damages due to the defamation by [Chief] Hazelwood, including damage to his reputation and mental anguish and suffering."

2.

A plaintiff establishes a claim for defamation by showing the following: "a party published a statement; . . . with knowledge that the statement is false and defaming to the other; or . . . with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." ***Sullivan v. Baptist Mem. Hosp.***, 995 S.W.2d 569, 571 (Tenn. 1999).

3.

As developed in the record, Sykes focuses a good portion – but not all – of his defamation claim on a written report prepared by Chief Hazelwood on the letterhead stationary of the "Chattanooga Housing Police" of the CHA, to the Tennessee Peace Officer Standards and Training Commission ("the POST Commission"). The letter was written *after* Sykes was terminated on September 30, 2004. The letter seeks to have the Post Commission revoke its certification of Sykes as a law enforcement officer. The three-page correspondence states, in some detail, Sykes' alleged

---

[1] Greene does not appeal the dismissal of his cause of action for defamation.

misdeeds committed in violation of the CHA's Code of Ethics and orders of the CHA Public Safety Department. In general, the letter states that Sykes' employment was terminated "for numerous violations of agency policies/procedures and general orders that constituted ethical violations and professional misconduct." As previously noted, the specifics of these violations are set forth in the letter.

Chief Hazelwood's letter purports to be written "[i]n accordance with T.C.A. [§] 38-8-104(b) [(2006)]," which states as follows:

> The [POST] commission, in addition to all the powers and duties vested in it by law, is vested with the power and is charged with the duty of observing, administering, and enforcing all the provisions of [Chapter 8 of Title 38 of the Code].

It is clear from the relevant statutory scheme, Tenn. Code Ann. § 38-8-101, *et seq.* (2006), that the POST Commission is an agency of the State of Tennessee. Among other statutory responsibilities, it is charged with the task of training, certifying and de-certifying individuals who seek to be, or are, "full-time police officer[s]," as defined by Tenn. Code Ann. § 38-8-101(1), *i.e.*, ". . . any person employed by any municipality or political subdivision of the state of Tennessee whose primary responsibility is the prevention and detection of crime, and the apprehension of offenders, and whose primary source of income is derived from employment as a police officer." *Id.* As investigators for the CHA, the plaintiffs fell within the jurisdiction of the POST Commission.

In support of his motion for summary judgment, Chief Hazelwood relies upon the defense of statutory immunity as set forth in Tenn. Code Ann. § 4-21-1003 (2005). That statute, in its entirety, provides as follows:

> (a) Any person who in furtherance of such person's right of free speech or petition under the Tennessee or United States Constitution in connection with a public or governmental issue communicates information regarding another person or entity to any agency of the federal, state or local government regarding a matter of concern to that agency shall be immune from civil liability on claims based upon the communication to the agency.
>
> (b) The immunity conferred by this section shall not attach if the person communicating such information:
>
> (1) Knew the information to be false;
>
> (2) Communicated information in reckless disregard of its falsity; or
>
> (3) Acted negligently in failing to ascertain the falsity of the information if such information pertains to a person or entity other than a public figure.

(c) A person prevailing upon the defense of immunity provided for in this section shall be entitled to recover costs and reasonable attorneys' fees incurred in establishing the defense.

It is beyond dispute that Chief Hazelwood's letter to the POST Commission is "regarding a matter of concern [*i.e.*, the issue of grounds for de-certification of a "full-time police officer"] to [the POST Commission]." The material filed by Chief Hazelwood in support of his motion for summary judgment reflects that there is no genuine issue of material facts on the issue of his affirmative defense of immunity from Sykes' claim of defamation to the extent that claim pertains to his communication to the POST Commission. The filings by Chief Hazelwood shows that he is entitled to the defense of immunity under Tenn. Code Ann. § 4-21-1003. This showing shifts the burden of production to Sykes to show that there is a genuine issue of material fact as to whether Chief Hazelwood is entitled to the defense of immunity under the statute. The establishment of an affirmative defense is one of the ways a defendant seeking summary judgment can shift the burden of production to a plaintiff. ***Hannan***, 270 S.W.3d at 5.

Sykes has testified that some of the statements made by Chief Hazelwood in the letter to the POST Commission are not true; but the issue now before us is not whether his statements are true or untrue, but, rather, in the words of Tenn. Code Ann. § 4-21-1003, whether Chief Hazelwood "*[k]new* the information to be false; *[c]ommunicated* information *in reckless disregard of its falsity*; or *[a]cted negligently in failing to ascertain* the falsity of the information if such information pertains to a person or entity other than a public figure." ***Id***. at (b)(1), (2), and (3) (emphasis added). While Sykes' testimony may well have created a genuine issue of fact as to whether the statements in the letter to the POST Commission were true, the material relied upon by Sykes fails to make out a genuine issue of material fact as to the "exceptions" language in the statutory immunity section of the statute. To the extent Sykes seeks to recover damages for defamatory language in the letter to the POST Commission, Chief Hazelwood is entitled to the statutory immunity and, hence, also entitled to summary judgment.

4.

The totality of the material relied upon by Chief Hazelwood in support of his motion for summary judgment on the defamation issue establishes there is no genuine issue of material fact with respect to any other communications by Hazelwood concerning Sykes. The material facts before us show that Chief Hazelwood did not make any defamatory statements to others. This shifted the burden of production to Sykes.

Sykes claims Chief Hazelwood discussed the alleged reasons for Sykes' termination with other officers of the CHA as well as officers of the Chattanooga Police Department and that the reasons given by the Chief were not true. At his deposition, Sykes listed the names of officers and other individuals with whom he claims Chief Hazelwood discussed his termination, but he has not produced affidavits from these witnesses attesting to this. His own testimony on these conversations is nothing more than inadmissible hearsay and cannot be considered by us on summary judgment. The material relied upon by Sykes to create a genuine issue of material fact – being inadmissible – is insufficient to create a genuine issue of material fact.

-7-

The trial court was correct in granting Chief Hazelwood summary judgment on the entirety of Sykes' defamation claim.

## B.

### 1.

We now turn to the trial court's grant of summary judgment on the plaintiffs' individual causes of action against Chief Hazelwood for intentional interference with their separate employment arrangements. The plaintiffs contend in their amended complaint that "[Chief] Hazelwood was well aware of the employment relationship between CHA and the Plaintiffs . . . [and] caused CHA to wrongfully terminate the employment of [the plaintiffs] . . . [and] possessed an improper motive and acted through improper means in causing these terminations . . . . [and the] Plaintiffs have suffered damages as a result of [Chief] Hazelwood's interference with their employment."

### 2.

Tennessee recognizes statutory and common law actions for unlawful inducement of breach of contract. *Givens v. Mullikin*, 75 S.W.3d 383, 405 (Tenn. 2002). Intentional interference with an at-will employment contract, without privilege or justification, is actionable. *Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994); *Baldwin v. Pirelli Armstrong Tire Corp.,* 3 S.W.3d 1, 6 (Tenn. Ct. App. 1999). The elements are the same under both statutory and common law claims:

> In order to recover on a theory of inducement to breach a contract, a plaintiff must allege and prove seven elements: (1) that a legal contract existed; (2) that the defendant was aware of the contract; (3) that the defendant intended to induce a breach of that contract; (4) that the defendant acted with malice; (5) that a breach of the contract occurred; (6) that the breach was a proximate result of the defendant's conduct; and (7) that the breach injured the plaintiff.

*Givens,* 75 S.W.3d at 405.

In *Lyne v. Price*, W2000-00870-COA-R3-CV, 2002 WL 1417177 (Tenn. Ct. App. W.S., filed June 27, 2002), an at-will employee of a university's athletic department sued her supervisor in his individual capacity for intentional interference with her employment when she was discharged by the university. *Id*. at *1. The trial court granted the supervisor's motion to dismiss. The motion was based upon Tenn. R. Civ. P. 12.02(1) and (6). *Id*. at *2. On appeal, we reversed, holding that the employee's amended complaint was "sufficient to state a claim against [her supervisor] in his individual capacity." *Id*. at *4. In the course of our opinion, we noted some of the applicable principles:

> A corporation may only act through its agents and employees; consequently, a corporate director, officer or employee is not individually liable for

tortuous interference with a corporate contract, such as an at-will employment agreement, so long as he is acting in furtherance of the corporate interest. A corporate director, officer or employee may be held liable for interference with such a contract if "he is acting outside the scope of his authority, acting with malice, or acting to serve his own interests." However, where there is intentional interference with an employment contract, there is frequently "some element of ill will"; consequently, where the director, officer or employee is generally acting in furtherance of the corporate interest, "the addition of a spite motive usually is not regarded as sufficient to result in liability." He may be held liable if "the reason underlying his interference is purely a malevolent one, and a desire to do harm to the plaintiff for its own sake." . . . [T]he public interest is served by corporations having candid advice from their officers and employees, and . . . fear of individual liability would limit such advice. Consequently, the actions of an officer, director or employee of a corporation are considered to be the actions of the corporation so long as he is acting "within the general range of this authority, and his actions are substantially motivated by an intent to further the interest of the corporation." Under these circumstances, the director, officer or employee is immune from individual liability.

*Id*. at *3 (citations omitted).

3.

In response to the plaintiffs' claims that Chief Hazelwood intentionally interfered with their employment, Chief Hazelwood in his answer acknowledges the obvious – that he was aware of the plaintiffs' employment by CHA; but he denies all other allegations relating to the plaintiffs' claims of intentional interference with employment. Additionally, Chief Hazelwood pleads, as an affirmative defense, that he is not subject to liability relating to the plaintiffs' claims "by virtue of his status as a supervisory employee of Defendant CHA [during] the time [frame of] the allegations described in [the c]omplaint." Pleading in the alternative, Chief Hazelwood "affirmatively avers that any actions he took, having any bearing whatsoever upon [the plaintiffs] and this lawsuit, during the time period described in the [c]omplaint were taken for legitimate, non-retaliatory reasons, and were an appropriate exercise of his authority as a supervisory employee of Defendant CHA without intent to retaliate or cause unprivileged or otherwise unlawful harm to [the plaintiffs]."

Regarding the events leading up to Sykes' termination, the affidavit of Andrew Lawrence of the CHA – the employee at the agency who investigated the employees' complaints – states that Chief Hazelwood was excluded from the agency's investigation launched by him to look into complaints made August 19, 2004, *i.e.*, that Sykes sexually harassed several female CHA residents. The stated reason for this exclusion was that Sykes had previously alleged at a July 27, 2004, meeting with Lawrence that Chief Hazelwood was engaging in improper and potentially unlawful

practices in his role as Chief of the CHA Public Safety Department. During that July meeting, Lawrence instructed Sykes that he should inform him if he *ever felt* he was being retaliated against for bringing grievances against Chief Hazelwood. An investigation Lawrence launched in July to look at the plaintiffs' grievances against Chief Hazelwood did not substantiate any of their complaints. During the investigation undertaken to examine the allegations of sexual harassment, Sykes was placed on administrative leave. The findings from that investigation led to his termination from the CHA on September 30, 2004.

In his deposition, Sykes alludes to a *feeling* that Chief Hazelwood wanted to hire a Knoxville police officer to fill his position, and that this is the source of Chief Hazelwood's animus toward him. He claims to have learned this from Frank Otis, but there is no affidavit in the record from Otis attesting to this information or its source. Sykes says that Felix Vess, Assistant Chief to Chief Hazelwood, was originally going to be a part of the investigation into the sexual harassment allegations. Sykes states he voiced his opposition to Vess's involvement due to the fact that Vess was allegedly involved in some of the activities regarding Chief Hazelwood about which the plaintiffs had previously complained. Officer Vess was the officer who wrote the letter on August 25, 2004, announcing Sykes' administrative leave. After this, Lawrence said he would exclude Vess from the investigation against Sykes. In his deposition, Sykes states that other than his *personal beliefs* and his wife's *personal beliefs*, he has no proof that his termination was retaliatory. He claims that he was never provided with the results of the investigation that led to his termination. However, he says that when Attorney Bryan Hoss asked who was responsible for his termination, Vess stated that Vess and Chief Hazelwood recommended that the CHA terminate Sykes' employment. Other than Sykes' hearsay testimony, Vess's alleged statement is not documented in the record. In his affidavit, Sykes claims that, when he approached one of the residents who made the sexual harassment allegations against him, she denied having made such an allegation. He also claims that he was informed by another resident – one who was present at the meeting when the allegations against him were supposedly made – that "the residents just talked about the public safety officers in general during the meeting and [Sykes] was not singled out." Neither of these residents' alleged assertions are properly supported by affidavit or otherwise in the record. Again, Sykes' recitation about them is hearsay.

Regarding Greene's termination, Lawrence's affidavit states that Greene "was terminated on January 19, 2005 as a result of his repeated violations of the CHA's cell phone policy." At the time of Greene's suspension in October 2004, he owed the CHA almost $2,000 in non-work related cell phone charges. According to Lawrence, when he asked Greene why his non-business related charges were so much greater than other employees, Greene stated that he didn't have a personal cell phone and that he was using the CHA cell phone to make all his personal calls. These alleged violations are well documented in the record and stretch out over a period of more than a year prior to his termination. Despite providing Lawrence with a letter outlining his intention to stop using the CHA cell phone for personal calls, Greene subsequently used the CHA cell phone to make over 1,000 personal calls during a month-long medical leave of absence.

In his deposition, Greene admitted that he did not have a personal cell phone and acknowledged using the CHA cell phone to make the personal calls in question. He admitted knowledge of the CHA cell phone policy and stated that he knew that he was in violation of it. He stated that the CHA told him that the cause of his termination was his violation of the cell phone policy. He contends the real reason for his termination was "[r]etaliation for [his] filing a grievance" but states that his basis for saying this is "just by personal, personal views." However, he contends in his affidavit that everyone violated the cell phone policy and only he was ever disciplined or terminated. He acknowledges that at the time of his termination, Chief Hazelwood wasn't present at the CHA and he didn't know what Chief Hazelwood's status at that time. He states that he hadn't seen Chief Hazelwood for some time prior to his termination from the CHA. Despite this, he contends Chief Hazelwood participated in his termination, but can't offer direct evidence that he played any role. He acknowledges that this belief is based on an *assumption*. In his affidavit, Greene states that, "[i]n a hearing on the grievance I filed on my termination, Felix Vess admitted that he and Jeff Hazelwood made the decision to terminate [him]. The hearing's minutes, contained within the record, support this contention.

According to Lawrence's affidavit, he and Matt Powell, the Executive Director of the CHA, made the decision to terminate both of the plaintiffs, and Chief Hazelwood was excluded from these discussions "to eliminate even the appearance of impropriety or 'retaliation' related to the same." In his affidavit, Chief Hazelwood denies "play[ing] any role in the terminations of either [Sykes or Greene]." Further, the various affidavits and other supporting documents included in the record by the defendants support their stated causes for the CHA termination of these two plaintiffs.

4.

The defendants have satisfied their burden of production required under the ***Hannan*** analysis by showing evidence that Chief Hazelwood played no role in the termination of either of the plaintiffs, evidence which affirmatively negates the essential element of the intentional interference with employment claim of each of the plaintiffs, *i.e.*, requiring that the defendant's conduct, in this case Chief Hazelwood, must have induced the breach of contract about which the plaintiffs complain, namely their terminations by the CHA. This evidence is presented in the affidavits of Lawrence and Chief Hazelwood and is referenced above. This evidence, if accurate, serves to show that Chief Hazelwood could not have interfered with their employment by participating in their terminations if he was never involved in the management's decision of the CHA to terminate. Therefore, in accordance with ***Hannan,*** Chief Hazelwood has shifted the burden of production to each of the plaintiffs who must present some evidence in support of this element to survive the chief's motion for summary judgment on their individual claims.

When considering the type of evidence sufficient to satisfy the nonmovant's burden of production under ***Hannan*** after the movant has satisfied its burden, we must limit ourselves to admissible evidence in the record that demonstrates the element contravened by Hazelwood's evidence. Mere opinions or expressions of one's personal feelings or beliefs are not enough. In

general terms, and certainly applicable here, opinions, beliefs, impressions and the like are not substantive proof of facts.

In this case, Greene in his deposition describes his *belief* that Chief Hazelwood must have been involved in his termination, but, again in his deposition, does not explain why he believes this or point to evidence in support of that "belief." However, in a subsequent affidavit Greene filed in opposition to the defendants' motion, Greene points specifically to the written minutes from his 2005 termination grievance hearing at which Officer Vess attributes to Chief Hazelwood at least some of the decision making as to whether Greene should be terminated. This evidence, which contradicts the evidence found in the evidence presented by Chief Hazelwood, establishes that there is a genuine issue of material fact as to whether Chief Hazelwood was involved in Greene's termination.

The dispute as to whether Chief Hazelwood was involved in Greene's termination, however, is not sufficient to save his claim under discussion from summary judgment. Even if Chief Hazelwood was involved in Greene's termination, there remains the issue of whether Chief Hazelwood was "acting in furtherance of the corporate interest" or whether his sole motivation was "purely a malevolent one, and a desire to do harm to [Greene] for its own sake," to use language from *Lyne*, 2002 WL 1417177 at \*3. The evidence submitted by the defendants shows that Greene's egregious violation of the cell phone policy was more than enough to justify his termination. So even if, again using language from *Lyne*, Chief Hazelwood had "some element of ill will," *id.*, his participation in Greene's termination for a more-than-sufficient legitimate reason – an "over-the-top" violation of the CHA cell phone policy – is not actionable. Therefore, the evidence before us establishes a legitimate reason for "interfering" with Greene's employment even assuming that Chief Hazelwood was involved in that termination. As previously noted, Greene admits his egregious violations of the CHA cell phone policy. The trial court's grant of summary judgment as to Greene's claim of Chief Hazelwood's intentional interference with his employment contract was proper.

Like Greene, Sykes also describes in his depositions his *belief* that Chief Hazelwood was involved in his termination. Unlike Greene, however, Sykes has not proffered evidence in support of that allegation. In the entire record, Sykes makes reference to two potential sources of outside evidence: he mentions in his depositions a comment Officer Vess made to Attorney Hoss in which Vess claimed that he and Chief Hazelwood decided to fire Sykes; and in his affidavit, Sykes claims that one of the women who accused Sykes of sexual harassment (the same type of accusation triggering the investigation that led to his termination) told him after his termination that she never made such allegations. However, neither of these references to potential evidence is supported via affidavit or otherwise supported in the written record. All of this testimony is hearsay and hence is inadmissible and cannot be used in this summary judgment analysis. Furthermore, even if Chief Hazelwood were involved, there was a very legitimate reason – "in furtherance of the corporate interest" – to terminate Sykes' employment, *i.e.*, the serious complaints against him for sexual harassment. In this regard, what we said in Greene's case applies with equal force to Sykes' situation.

We hold that the trial court was correct in granting the defendants' motion for summary judgment as to Sykes' claim against Chief Hazelwood for intentional interference with Sykes' employment contract.

C.

1.

Next both plaintiffs claim that the trial court erred in granting summary judgment to the CHA on their causes of action for retaliatory discharge based upon their complaints of illegal activity by the CHA. They contend in their amended complaint that "[t]he sole reason for [their] terminations was their refusal to participate in or refusal to remain silent about illegal activities. . . . [and their terminations] have caused them loss of income and benefits, loss of employment opportunity, and humiliation and embarrassment. . . . [and they] are entitled to damages and attorneys' fees . . . for [the] Defendants' retaliatory discharge."

2.

While the employment-at-will doctrine has long been established in Tennessee, the Supreme Court has recognized exceptions to that doctrine. These exceptions prevent an employer from firing an at-will employee when doing so would violate a clearly established public policy. *Collins v. AmSouth Bank*, 241 S.W.3d 879, 884 (Tenn. Ct. App. 2007). *Id.*

In 1990, the Tennessee General Assembly adopted Tenn. Code Ann. § 50-1-304 (2008) as part of the Public Protection Act of 1990. *Collins*, at 884. The statute, which is commonly referred to as the "Whistleblower Act," is an exception to the common law employment-at-will doctrine. *Id.* The statute provides, in pertinent part, as follows:

> (b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.
>
> *  *  *
>
> (d)(1) Any employee terminated in violation of subsection (b) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

Tenn. Code Ann. § 50-1-304.

There are four elements of a cause of action pursued under Tenn. Code Ann. § 50-1-304:

> (1) Plaintiff's status as an employee;

-13-

(2) Plaintiff's refusal to participate in, or to remain silent about, illegal activities;

(3) Employer's discharge of the employee;

(4) Exclusive causal relationship between the Plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.

*Voss v. Shelter Mut. Ins. Co.,* 958 S.W.2d 342, 344 (Tenn. Ct. App. 1997). In this statutory cause of action, the plaintiff must show that the employer's violation was "the *sole* reason for his discharge." *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. 2002) (emphasis in original).

3.

We will start out by stating the obvious. The plaintiffs' status as employees is not disputed. Nor is it disputed that they were discharged. The trial court held, however, that "[t]here is no evidence in this case that either of the plaintiffs was asked or required to participate in or remain silent about any illegal activity."

In their complaint, the plaintiffs state that "[d]uring their employment, [they] witnessed several unconstitutional and unlawful searches of residences, incidents of excessive force, violations of HUD regulations and other unconstitutional and illegal activities. . ." They also allege that they raised their concerns about the illegal actions "with the human resources manager and the assistant director." In addition, they filed grievances including charges that Chief Hazelwood and Officer Vess ordered and engaged in racial profiling and that Chief Hazelwood conducted illegal searches and seizures and used excessive force in the line of duty.

The majority of the issues raised by the plaintiffs in their July 27, 2004, and subsequent grievances to Mr. Lawrence concern not violations or perceived violations of the law, but rather the way that the CHA Public Safety Department was operated under Chief Hazelwood and the chief's attitude and behavior toward the plaintiffs, other CHA employees, and residents of the CHA's housing developments. Among these issues are allegations that Chief Hazelwood frequently uses profanity and prefers an aggressive, "SWAT team" tactical style to the plaintiffs' dismay. While these complaints may have been justified criticisms of department policy, they are not violations or perceived violations of the law protected by the Whistleblower Act.

The plaintiffs did report two potentially unlawful activities in separate grievances to Lawrence on July 27, 2004, that would fall within the Whistleblower Act's narrowly-tailored provisions. These activities are allegations of perceived unlawful searches and seizures reported by Greene and perceived racial profiling reported by Sykes, and both charges directly involve Chief Hazelwood. Regarding the unlawful search and seizure allegations, Greene recounts one incident where he and

-14-

Chief Hazelwood saw an apparent drug transaction occur between two men, one of whom subsequently entered a residence on the CHA's property. The officers had no search warrant and the female residing at the CHA residence in question refused to sign a release. According to Greene, Chief Hazelwood nonetheless started searching, rummaging through drawers. Chief Hazelwood then claimed to have found crack cocaine inside a Crown Royal bag and arrested the female resident. Greene stated he was told by Chief Hazelwood to say that the crack was in plain view, but, according to Greene, it was not.

The second allegation concerns a policy of perceived racial profiling, supposedly organized, authorized, and carried out by Chief Hazelwood. This allegation was primarily voiced by Sykes but also echoed by Greene, who testified at his deposition that Chief Hazelwood "basically said if you're a black male on the housing authority property, then [you] don't belong, period." Greene testified that Chief Hazelwood instructed him to give African-American males, ages 18-35, criminal trespass citations or take them to jail. A letter written by Greene at the request of Lawrence – the purpose of which was to confirm issues raised at the July 27, 2004, meeting – shows clearly that Greene raised issues concerning racial profiling and illegal searches and seizures. The plaintiffs provide evidence in the record supporting these facts. Without detailing every assertion, it is sufficient to note that Sykes and Greene both asserted that racial profiling was being conducted by Chief Hazelwood.

4.

The trial court incorrectly concluded that the law requires that a plaintiff show an instruction from his or her employer to participate in illegal activities. There is no such requirement in the law. *Mason v. Seaton,* 942 S.W.2d at 475-76. Furthermore, the plaintiffs do not have the burden of proving that the actions they complained of were conclusively illegal. Rather, it is sufficient if they had reasonable cause to believe that illegal conduct had occurred or would occur and reported it in good faith. See *id.* at 472. ("The statute's protection extends to employees who have reasonable cause to believe a law, regulation, or rule has been violated or will be violated, and in good faith report it.")

The defendants apparently understand this concept because they argue that there was no reasonable basis for Sykes' belief that being asked to issue a criminal trespass citation or arrest and jail every male between the ages of 18 and 35 that came into a housing development was profiling. They point out that the chart Sykes was instructed to use referred only to *gender* and not to *race*. Sykes has a different view as to the instruction he received from Chief Hazelwood. There is clearly a dispute of fact about the thrust of the instruction.

The defendants next argue that it was insufficient for the plaintiffs to merely report their concerns within the CHA. In support of this argument, they cite *Merryman v. Central Parking Sys.*, No. 01A01-9203-CH-00076, 1992 WL 330404, (Tenn. Ct. App. W.S., filed November 13, 1992). In *Merryman*, this Court held that reporting the suspect behavior to the offending supervisor himself instead of reporting it to management did not qualify the plaintiff as a whistle blower. *Merryman*, 1992 WL 330404, at *7. But reporting to "either company management or law enforcement officials"

does qualify as whistle blowing. ***Emerson v. Oak Ridge Research Inc.,*** 187 S.W.3d 364, 371 (Tenn. Ct. App 2005). In this case, the plaintiffs complained to their supervisors as well as CHA management and board members. Sykes went to the District Attorney, HUD and the Tennessee Bureau of Investigation, and the plaintiffs complained of illegal activities at the CHA when they filed charges of discrimination with the Tennessee Human Rights Commission ("the THRC"). The plaintiffs met the applicable legal standard since they reported the allegedly illegal activities to appropriate parties both within and outside CHA.

The Fourth Amendment of the United States Constitution applies to all seizures of person, including brief stops, as well as the targeting of an individual solely by reference to race. ***United States v. Brignoni-Ponce,*** 422 U.S. 873 (1975). The Equal Protection Clause also prohibits selective enforcement of the law based on impermissible criteria, such as race. ***Whren v United States,*** 517 U.S. 806, 813 (1996). The same is true under the Tennessee Constitution. *See **State v. Vineyard,*** 958 S.W.2d 730, 734 n.6 (Tenn. 1997). At a minimum, there is a factual dispute whether the plaintiffs had a reasonable basis to believe that the "citation or arrest and jail" policy organized, authorized, and carried out by Chief Hazelwood was effectively racial profiling. Giving every benefit of the doubt to the plaintiffs, as we must, these two specific allegations of perceived illegal behavior on the part of Chief Hazelwood show a genuine issue of material fact as to the second element of their Tenn. Code. Ann. § 50-1-304 claim. There is clearly a genuine issue of material fact as to whether the plaintiffs acted in good faith.

The fourth element of the Whistleblower Act requires that the plaintiffs show causation between their complaints of illegal activities and the adverse actions taken against them. The defendants argue that the plaintiffs have not shown this causal link. To satisfy the element of causation in a prima facie case for retaliatory discharge under Tenn. Code Ann. § 50-1-304, each plaintiff must demonstrate an *exclusive* causal relationship between his reporting of illegal activities to management and his termination. *See **Collins***, 241 S.W.3d at 884 ("Therefore, the primary difference between the common law and statutory claims is that, to benefit from statutory protection, an employee must demonstrate that his or her refusal [to participate in illegal conduct] was the *sole* reason for his or her discharge") (emphasis in original).

In this case, the defendants have shown a legitimate basis for terminating the plaintiffs. This shifts the burden back to the plaintiffs to show that the reason stated is mere pretext and that an intent to retaliate was the *sole* basis for their termination.

The trial court apparently assumed that the evidence of causation must be direct evidence. For example, the trial court said Greene "has not produced any evidence that anyone at CHA who participated in the decision to terminate him was doing so as a result of any refusal to participate in or remain silent about CHA's activities." It is well established in employment law cases, that there will rarely be direct evidence of retaliation. Accordingly, we feel compelled to first review the types of circumstantial evidence that can make out a case of retaliation before we address the topic of whether the plaintiffs supplied any direct evidence of causation in their Whistleblower Act claims. What we will say applies with equal force to both plaintiffs.

In a 2002 retaliatory discharge case, the Tennessee Supreme Court said that "the essential factor to be determined is the employer's motivation . . . .[D]irect evidence of that motivation is rarely within the plaintiff's possession." **Mason**, 942 S.W.2d at 474. Consequently, the reviewing court must make a determination whether the "proffered admissible evidence shows circumstances that would be sufficient to permit a rational trier of fact to infer a [retaliatory] motive. *It is not the province of the summary judgment court itself to decide what inferences should be drawn." **Guy v. Mutual of Omaha Ins. Co.,** 79 S.W.3d 528, 534 (Tenn. 2002) (quoting **Mason**, 942 S.W.2d at 474) (emphasis added).

One circumstantial piece of evidence is the timing of discipline and termination. On this point, Sykes point out that he filed his grievance on June 24, 2004. He alleges that, after he gave copies of the grievance to Chief Hazelwood, he began immediately to be treated differently from similarly situated officers who had made no such complaints. His grievance hearing was on July 27; less than a month later he was suspended. A month after that he was terminated. On October 4, 2004, less than a week after the CHA terminated Sykes' employment, it suspended Greene. As defendants note in their brief, Greene had been in violation of a cell phone policy since the beginning of his employment, but he was not suspended for the violation until just after the CHA fired Sykes. The timing of the suspension raises an issue as to the motive for it. Greene took a month of intervening Family Medical Leave Act ("FMLA") time off, but his employment was terminated on January 19, 2005, a period of just over three months from the suspension to the termination.

In **Allen v. McPhee**, a case involving sex discrimination, the Tennessee Supreme Court adopted the rule that "close temporal proximity of a complaint and a materially adverse action are sufficient to establish a prima facie case of causation." **Allen v. McPhee,** 240 S.W.3d 803, 823 (Tenn. 2007)(discussing causation in the context of a THRA retaliation claim). In **Allen,** the Court said:

> In this case the [Tennessee Board of Regents ("the TBR")] first attempted to reassign Allen two weeks after the filing of her complaint. When Allen declined to accept the reassignment, she was allowed to remain on paid leave while the TBR concluded its investigation. Allen was then officially reassigned when the TBR accepted the findings and recommendations of the investigation less than two months after Allen filed her complaint. These facts indicate a close temporal proximity of the complaint and the reassignment and therefore allow an inference that the TBR was motivated by an intent to retaliate.

*Id.* The time element with respect to Sykes in the case at bar is comparable to the facts of Greene's case, and as soon as Sykes was gone, Greene was terminated in a similarly short time frame.

The Supreme Court has held that "[t]he evidence of a good work history presented by the plaintiff" can "establish a causal relationship between [the] reporting of the suspected illegal activity at [the] place of employment and [the] discharge." **Mason**, 942 S.W.2d at 474. In this case, the

plaintiffs point to their good performance records as evidence their whistle blowing led to their terminations. Sykes had received a good performance review in November 2003 as well as raises in January and May 2004. Chief Hazelwood testified that Greene had never received discipline prior to his grievance. As in *Mason*, these facts allow a trier of fact to draw the reasonable inference that there existed a causal relationship between the reporting of illegal activities and the terminations.

Tennessee courts have recognized that circumstantial evidence, which can satisfy the causation element of a prima facie case of retaliatory discharge, includes "the employer's failure to adhere to established company policy." *Newcomb v. Kohler Co.,* 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006). In the case before us, Sykes points to evidence that the CHA did not follow its own personnel policies. Specifically, Sykes claims the CHA failed to properly investigate the plaintiffs' grievances and that it allowed Officer Vess, who was frequently named in the plaintiffs' grievances along with Chief Hazelwood, to announce Sykes' suspension and participate in the investigation that led to his termination. Only after Sykes adamantly objected was Officer Vess excluded from the CHA's investigation launched to look into the sexual harassment allegations raised against him. Additionally, the record reflects that Officer Vess was the supervisor who actually suspended Greene. Officer Vess's involvement in his suspension so upset Greene that he filed another grievance, this one specifically alleging retaliation, with Lawrence.

The circumstances of the suspension of Sykes bring into question whether that action was arguably motivated by retaliation. Rather than simply meet with Sykes in the normal course of business, Officer Vess called his cell phone and told him not to attend a meeting with OIG inspectors. Then, when Officer Vess delivered the suspension to Sykes, he brought with him Lawrence, several CHA officers and Chattanooga Police Department officers. A jury could reasonably find that the makeup of the group delivering the message was for the purpose of harassing, intimidating and embarrassing Sykes. This conclusion is reinforced by the fact that the written notice of suspension gave no reason for it and Officer Vess gave no reason when Sykes asked for one. It could be concluded from all of this that Sykes' disciplinary action was not handled in a routine way. We accredit Sykes' version of this as we are required to do in this summary judgment analysis.

Similarly, the circumstances of Greene's suspension could arguably be interpreted to suggest that it was the result of retaliation. Greene was removed from his patrol. His car and cell phone were taken and he was assigned to work the desk job, not during normal office hours, but from 5:00 p.m. to 3:00 a.m., Wednesday through Saturday. In fact, the latter part of the discipline was so suspiciously retaliatory in nature that when Greene called attention to it, the CHA's human resources office immediately ordered that his desk duty hours were to conform to normal office hours.

As previously noted, the defendants argued that it is undisputed that Chief Hazelwood had nothing to do with the terminations. The record reflects that his involvement in each plaintiffs' termination is hotly contested. Both of the plaintiffs claim in their depositions and affidavits that Chief Hazelwood was involved in their terminations. However, only Greene points to any direct evidence in the record to support the involvement by Chief Hazelwood. As noted earlier in this

opinion, in the minutes of Greene's 2005 termination grievance hearing, Officer Vess stated that he and Chief Hazelwood recommended Greene's termination.

According to *Hannan,* as we have pointed out, in a summary judgment motion the "moving party who seeks to shift the burden of production to the nonmoving party . . . must either (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan*, 270 S.W.3d at 8-9. We have already established that the defendants have not carried this ultimate burden of showing an absence of a genuine issue of material fact with respect to the second element of the employees' claims, *i.e.*, refusal of each plaintiff to participate in, or to remain silent about, illegal activities. Thus, in the present case, for each employee, the defendants' motion, in order to be successful, must either negate the Employee's "exclusive" causation element of his retaliatory discharge claim or else show that he cannot prove "exclusive" causation at trial. If they cannot do this, the defendants' motion must be denied.

Greene was terminated for, according to the CHA, violations of its cell phone policy. The CHA cell phone policy states:

> CHA provides cell phones for Agency business activities. Every user has the responsibility to use CHA cell phones in a responsible and productive manner. Due to the cost associated with cell phone usage, only incidental personal non-business related use is permitted.

Misuse or excessive personal use of agency cell phones is subject to management review and may result in reimbursement charges to the employee and/or disciplinary action." On April 28, 2004 Greene signed and returned a CHA memorandum indicating that he had received an updated version of this manual and was responsible for abiding by all CHA personnel policies and guidelines.

There is a well-documented written record of Greene's habitual violations of the CHA cell phone policy over a more than 18-month period, which we will summarize. In March of 2003, Greene was hired as a CHA Criminal Investigator. On June 19, 2003, a letter was sent from Chief Hazelwood to all CHA Public Safety Department employees including Greene. The subject of the letter was "Cell Phone Overages." It stated in part:

> As we have discussed, you will be responsible for reimbursing the agency for all overages that are not work related. The charges for air time over and above that allowed on your individual plans are listed below. If you feel that any of these charges are work related and that you should not be responsible for paying them, please provide me with a detailed, written justification.

The next letter, dated August 5, 2003, was also sent to all Public Safety Department personnel. It reiterated the main points of the June letter, reminding employees that they are responsible for all overages they incur unless they can document the overages are work-related, adding in part: "*Failure to comply with this directive will result in disciplinary action.*" (Emphasis in original.)

Following this letter, Chief Hazelwood sent out a number of monthly letters outlining how much each employee owed in cell phone overages for the previous month and a deadline for paying the overages. Employees were to initial by their names, acknowledging the overage on each letter. In the March 24, 2004, letter sent by Chief Hazelwood for the February 2004 billing cycle, for example, Greene had $322.94 in overages. The next highest overage for that month was $20.49. A letter dated July 8, 2004, was sent by Chief Hazelwood to all employees. It was titled "Cell Phone Audit." This letter outlined that Greene still owed CHA $322.94 for his February 2004 cell phone overage. This pattern of running up excessive overages continued, and by October 4, 2004, a letter from Chief Hazelwood indicated that Greene owed CHA $1,881.24 in cell phone overages for "the months of February, June, July, and August, 2004 and from the most recent billing cycle, September, 2004." This was the letter that announced Greene's three day suspension and it also announced that he was "required to pay this amount in-full prior to 5:00 pm, Friday October 8, 2004 . . . . Failure to pay in-full by the date indicated will result in additional disciplinary action *up to and including termination*." (emphasis added). At the time of his suspension, Greene admitted he did not have a personal cell phone and acknowledged using his CHA-issued phone to make personal calls.

Despite these repeated written warnings, Greene did not pay his overages in full by October 8, 2004, as his suspension letter demanded. Rather, he sent a letter to the CHA in which he wrote, "[t]o resolve this problem, I intend to limit my personal calls on CHA cell phones." On October 13, 2004, Officer Vess sent Greene a letter announcing he would be put on a 60-day payment plan to eliminate his debt to the CHA. Following his three-day suspension for excessive cell phone overages, Greene was also put on desk duty during a night shift and his CHA cell phone and vehicle were taken from him. Greene was told by Officer Vess that these actions were a result of cell phone policy violations. He was further told by Officer Vess that he would return to his normal duties once the overages were paid. On October 15, 2004, Greene wrote a letter to Lawrence, which he referred to as his second grievance, complaining of Vess's most recent actions. In this letter he accused Chief Hazelwood and Officer Vess of showing "complete prejudice toward [him] returning to work and also created a hostile work environment for [Greene] to be in." As a result of his complaint, he was returned to the day shift. The record shows he promptly returned to his behavior of running up overages and using the phone for personal calls in violation of CHA policy. Furthermore, at the end of the sixty-day payment plan, Greene still owed the CHA $333.69.

In December 2004, Greene took a one-month FMLA absence. By his own admission, Green did no work during this period for the CHA. Despite this, he used his CHA-issued phone to make 1,044 calls. Greene returned to work in January 2005 and was terminated from CHA on January 19, 2005. Greene stated that the CHA told him that he was terminated for "violation of policy, cell phone, misuse of cell phone." According to the record, Greene acknowledged being warned about overages prior to his termination. Specifically he acknowledged knowing prior to being terminated that the misuse of the CHA cell phone could lead to his termination. He also acknowledged that he knew about the written CHA cell phone policy at the time of his suspension. Despite the quantum of evidence supporting this assertion, Greene maintained his *belief* that he was really terminated for

"retaliation for [his] filing a grievance." He stated that his support for this *belief* was based on his "*personal views*."

Based upon the evidence the defendants have presented, they have clearly negated the *exclusive* causal relationship requirement of the fourth element of Greene's Tenn. Code. Ann. § 50-1-304 claim. The burden then shifts to Greene to produce evidence showing exclusivity in order to defeat the defendants' motion. As stated in **Guy**, Greene is required to show some evidence that his whistle blowing behavior was the "*sole* reason for his termination." **Guy**, 79 S.W.3d at 537 (emphasis in original). This is something Greene has failed to do. As mentioned previously, Greene produced evidence of a statement Officer Vess made during his termination grievance hearing that Vess and Hazelwood made the decision to fire him; but that evidence, if true, does not speak to him being fired for any reason other than that provided by CHA. The facts before us clearly show a unrebutted, legitimate, non-pretextual basis for his termination, and, hence, retaliation could not be the "sole cause" of his termination. The evidence pointed to by Greene in fact substantiates that he was terminated solely for cell phone policy violations. Based on this, we affirm the trial court's grant of summary judgment as to Greene's Whistleblower Act claim.

With respect to Sykes' Whistleblower Act claim, the parties disagree as to whether Sykes received a reason for his termination; Sykes maintains that he was given no cause while the CHA maintains that he was told he was being terminated for sexually harassing and inappropriately interacting with CHA residents, among other reasons. For the purposes of their summary judgment motion, the defendants must affirmatively negate the causation element of Sykes' claim in order to shift the burden of production to him to offer evidence that a genuine issue of material fact exists to be resolved by the finder of fact.

Sykes was originally hired in July 2002 to help develop the CHA Public Safety Department, which was then in its infancy. The CHA hired Chief Hazelwood to head the department; he was previously employed by the Public Safety Division of the Knoxville public housing agency. Chief Hazelwood hired Officer Vess, also from the Knoxville agency, to be Assistant Chief of the Department. Sykes was third in line. Conflicts between the three employees presented as early as October 2002, when Sykes was reprimanded for having "opened his supervisor's paycheck, discussed his supervisor's rate of pay with co-workers and spoken negatively about CHA's Public Safety Department generally both within and outside the Department." On the reprimand form filled out for this incident by the Public Safety Department, Sykes hand wrote by his signature "I do not agree with alleged 'performance' section of this reprimand form." Then, in a meeting on June 22, 2004, after a record of generally positive performance reviews and several pay increases, Chief Hazelwood and Officer Vess presented Sykes with a Performance Improvement Plan that was critical of his tardiness and ability to investigate and close cases in a timely manner. During this meeting, "Mr. Sykes became belligerent, began yelling at [Chief Hazelwood], standing up out of his chair, banging on the table that was sitting between [the parties], and stormed out of the meeting at least a couple of times."

At this point, the parties begin to dispute many details. The defendants use Sykes' reaction to these two written criticisms of his employment performance to establish a pattern of insubordination, painting Sykes as a "chronic complainer" who believed that he was treated differently because he was from Texas rather than Knoxville.  Sykes believed that Chief Hazelwood gave preferential treatment to the officers he hired from Knoxville. There is evidence in the record that Sykes harbored these feelings. Sykes maintains that, after filing his grievance with Lawrence on June 27, 2004, he began to be treated differently from his co-workers. He appears to associate the Performance Improvement Plan with retaliatory motive and refers to it as evidence of such; however, the Performance Improvement Plan was presented to him *before* he filed his first grievance.

Following the receipt of his Performance Improvement Plan, Sykes' normal employment duties continued until he was notified of his suspension on August 30, 2004. He was suspended with pay pending an investigation of allegations of sexually inappropriate behavior. Specifically, on August 19, 2004, "two residents of the CHA's public housing developments complained in an area resident counsel meeting that one of them was being evicted because she would not let Mr. Sykes, as she put it, "get into her panties". These residents submitted a written statement dated August 26, 2004, to this effect.  The investigation of these allegations included interviews the CHA's Human Resources office conducted with other members of the Public Safety Department as well as employees from other departments who worked in the CHA public housing developments, and several public housing development residents. This investigation brought to light other accusations of sexually inappropriate behavior by Sykes. Officer Erik Reeves, one of Sykes' co-workers, submitted an affidavit in which he mentioned inappropriate contact between Officer Sykes and female CHA public housing residents. On one occasion, he recalls seeing Officer Sykes "run into a female resident's unit without knocking one morning" and then "saw him standing in the doorway of the resident's unit talking to the resident who was wearing only a robe." Another CHA employee claimed to have found photographs of nude women inside a CHA camera and to have approached Sykes about the photos, asking if he knew anything about them. She claimed that he acknowledged they were his after which he seized the photographs and destroyed them. She submitted a written statement to the CHA Human Resources office to this effect, and it is included in the record.

During the investigation, the defendants allegedly made new discoveries about Sykes that further brought his fitness as a CHA employee into question. According to Officer Vess's affidavit, "several arrest warrants which had not been filed with the appropriate court along with some drug paraphernalia which had not been properly secured in the CHA's Public Safety Department evidence room were found in Mr. Sykes' desk."  This is confirmed by Officer Reeves, who states in his affidavit that he found these items in Sykes' desk.  Official written documentation of the unfiled warrants and improperly secured evidence is present in the record.  Both the unfiled warrants and improperly-secured evidence constitute violations of the CHA Public Safety Department's General Orders.

Furthermore, Officer Vess "also received an arrest warrant from the Hamilton County Criminal Court which indicated that Mr. Sykes had arrested a man in a local bar off CHA premises, exceeding his authority as a CHA Criminal Investigator."  This arrest warrant, dated April 3, 2004,  is also a

part of the record. This led to the discovery that Sykes and Greene were running a side business, offering security services to local businesses. In his affidavit, Officer Vess states Sykes originally claimed to be armed at the Whole Nite Club, the local bar where he arrested the man off CHA property. Tennessee POST-certified public safety officers are not supposed to be armed in any establishment which serves alcohol unless they are on duty. Further, in his affidavit, Officer Vess states "CHA also does not allow its Criminal Investigators to be employed by other entities as public safety/security officers and did not do so in 2004." Officer Vess states that Sykes later denied being at that bar in a security officer capacity and being armed at the time the arrest was made. Sykes admitted running his side business with Greene, and a copy of their business card listing the CHA Public Safety Department fax number is in the record. Finally, CHA received a letter from Chattanooga State Community College inquiring about a CHA-funded scholarship opportunity Sykes allegedly promised a female CHA resident who was taking classes there.

Following all of these discoveries, Sykes met with Human Resources staff and Assistant Director Bob Dull on September 16, 2004, to discuss the findings of the investigation and for the purpose of giving Sykes an opportunity to respond to the findings. He stated there "might have been" some evidence in his desk that he couldn't properly secure in the evidence room because of problems with a lock on the door to that room, and that the Chattanooga State student "might have gotten the idea" about the scholarship when he told her he "might could help" her get some financial aid through his church. He offered no explanations for any of the other findings of the investigation. As noted earlier by us, Sykes' employment as a criminal investigator for CHA was terminated on September 30, 2004.

The defendants have shown in the record that the results of the investigation into Sykes showed a reasonable and non-pretextual cause for his termination. By providing evidence that affirmatively negates the "exclusive" cause requirement of the Whistleblower Act claim, the defendants shifted the burden to Sykes to show direct or circumstantial evidence that a genuine issue of material fact related to the issue of "sole" causation remains to be resolved. We have already elucidated the various forms of circumstantial evidence that may be used to establish causation in wrongful termination actions. The burden is on Sykes to show evidence of an "exclusive causal relationship" between his whistle blowing and his termination. First, he points out the way in which he was informed of his suspension, which he claims was a deviation from established policy, and which occurred right before he was set to meet with an OIG investigator to discuss the same concerns he claims as whistle blowing in this cause of action. Second, he points to the fact that the letter announcing his suspension, present in the record, does not state why he was being suspended. Third, he points out that Lawrence was initially going to allow Officer Vess to participate in the investigation into the sexual harassment allegations made against him until he objected. Fourth, he denies the findings of the CHA investigation against him and complains it was one sided. Fifth, he hints that the stated reasons for his termination, which could be described as a portfolio of behavior unfitting of a CHA officer, discovered during the investigation, were pretextual. While this circumstantial evidence in its totality does arguably suggest possible causation, it falls far short of showing the "exclusive" causal relationship demanded by the Whistleblower Act.

In this case, Sykes offers no direct evidence of causation in the record. In his affidavit and depositions he suggests that other evidence exists in further support of the required causation. But he never presents that evidence. His affidavit in opposition to the defendants' summary judgment motion offers very little of substantive value. In fact, much of Sykes' affidavit was properly stricken by the trial court as being speculative, hearsay, or both. For example, he states that one of the women who alleged sexual harassment told him after his termination that she never made that claim. Sykes' accusations on the one hand and denials on the other are insufficient to defeat summary judgment as to the element of his claim requiring a showing of "exclusive" or, in other words, "sole" causation relationship. This woman's statement, if actually made, and any other additional evidence, should have been reflected in the record by affidavit or other means pursuant to Tenn. R. Civ. P. 56.06. ***Byrd v. Hall***, 847 S.W.2d at 210. In a summary judgment motion, when the moving party properly supports its motion, it is incumbent upon the nonmoving party to show, by admissible evidence, that some essential fact remains to be resolved by the trier of fact. ***Id.*** Sykes did not offer even a scintilla of additional, admissible evidence that suggested any remaining issue of material fact existed as to the issue of "exclusive" causation. The record before us is clear that, with respect to each plaintiff, there is an abundance of unrebutted evidence of a non-pretextual reason for their terminations. Hence, retaliation cannot be the "exclusive" cause even if it were one of the causes. Accordingly, we affirm the defendants' motion for summary judgment with respect to Sykes' Whistleblower Act claim.

D.

1.

Finally, the plaintiffs appeal the trial court's grant of summary judgment on their THRA claim against the CHA. They contend in their amended complaint that their "terminations were in retaliation for [their] filing of claims under the Tennessee Human Rights Act. . . . [and that both CHA and Chief Hazelwood] are liable under Tenn. Code Ann. § 4-21-101 for retaliation in violation of the Human Rights Act. . . . [and they] are entitled to damages and attorneys' fees . . . for [the] Defendants' retaliatory discharge."

2.

To state a claim for retaliation under the THRA, a plaintiff must establish that:

> [T]he plaintiff engaged in a protected activity; . . . the exercise of the plaintiff's protected civil rights was known to the defendant; . . . the defendant thereafter took an employment action adverse to the plaintiff; and . . . that there was a causal connection between the protected activity and the adverse employment action.

***Newsom v. Textron Aerostructures***, 924 S.W.2d 87, 96 (Tenn. Ct. App. 1995). Among activities that courts have considered as constituting the opposition to discriminatory practices are "publicly

and privately expressing that an employer has illegally discriminated" such as reporting illegal discrimination to supervisors. *See Wilson v. Wayne County*, 856 F. Supp. 1254, 1260 (M.D. Tenn. 1994). As can be seen, the THRA claim does not require the exclusivity of causation required in the Whistleblower Act. This distinction is important in our resolution of the THRA claims of the plaintiffs.

3.

We now move to the plaintiffs' claim of retaliation for their discrimination claim. The defendants argue that the plaintiffs' filing of a lawsuit based upon their charges of discrimination – at a time before the THRC completed its investigation – was somehow improper. Contrary to the defendants' point, however, it has been held that a plaintiff may proceed directly in state court by filing a complaint within one year of the discriminatory act or acts. ***Hoge v. Roy H. Park Broad. of Tenn., Inc.***, 673 S.W.2d 157, 160 (Tenn. Ct. App. E.S., 1984). There exists no requirement in Tennessee that a discrimination complaint be first filed with THRC or that once a charge is filed with THRC, the plaintiff must wait for the agency to conclude its investigation before proceeding to court. ***Puckett v Tennessee Eastman Co.***, 889 F.2d 1481, 1485 (6th Cir., 1989) ("the nature of the chancery court action as a discrete and additional remedy compelled a conclusion that the legislature did not intend the commencement of administrative proceedings to operate as an election and foreclose a judicial remedy").

As previously noted, the defendants have asserted substantial evidence of legitimate, non-discriminatory business reasons for terminating the plaintiffs. Those reasons, however, are hotly disputed by both Greene and Sykes. Nevertheless, as Tennessee law has been applied, the assertions of the CHA require the plaintiffs to show that the reasons advanced by CHA are pretextual. *See, e.g., **Hill v. Perrigo of Tennessee**,* No. M2000-02452-COA-R3-CV, 2001WL 694479, at *6 (Tenn. Ct. App. M.S. filed June 21, 2001) (citations omitted).

The following circumstantial evidence (which has been discussed earlier) meets that burden: the proximity in time between the making of the complaints and the adverse actions; the alleged failure to follow proper personnel policies as to investigations of grievances; the involvement of Officer Vess, whom plaintiffs allege engaged in acts and conduct of discrimination, in the suspensions and terminations of the plaintiffs; the evidence showing the involvement of Chief Hazelwood in Greene's termination; the established solid work histories of both plaintiffs; the nature of Officer Vess's involvement in Sykes' suspension, accompanied as he was at the time of Sykes' suspension, by officers of the CHA Public Safety Department, the Chattanooga Police Department and CHA's manager of Human Resources.

The defendants point to the overwhelming evidence of non-pretextual reasons for the termination of both plaintiffs. We agree there is substantial evidence. But it is not for us to weigh the evidence showing non-pretextual reasons for the plaintiffs' termination against the circumstantial evidence of the plaintiffs set forth above. It is for the finder of fact to do this weighing. Having

found evidence on both sides of the "causation" issue, our role is concluded by acknowledging there is an issue to be resolved by those who must decide the facts in this case.

4.

We hold that the circumstantial evidence creates a genuine issue of material fact as to whether the plaintiffs, and, more specifically, each of them was retaliated against by termination of their employment for having opposed discriminatory practices, including illegal arrests based on racial profiling and other discriminatory actions against the mostly African-American residents of the CHA's housing developments. If a jury found this circumstantial evidence to be credible, it could reasonably find that the reasons given for terminating the plaintiffs were pretextual in nature and that the real reason for the terminations was in retaliation for the plaintiffs complaining and reporting of discriminatory practices. We hasten to add, however, that we are not saying a jury should or will so find, only that they could. We emphasize, again, that it is not our role in the judicial system to weigh one side's evidence against the other. Accordingly, we hold that summary judgment on the plaintiffs' THRA claims is not appropriate.

V.

In summary we (1) affirm the grant of summary judgment to Chief Hazelwood on Sykes' claim of defamation; (2) affirm the court's grant of summary judgment as to the claims of Greene and Sykes against Chief Hazelwood for inducement of breach of contract; (3) affirm the grant of summary judgment to the CHA as to both plaintiffs' claims under Tenn. Code Ann. § 50-1-304; and (4) vacate the grant of summary judgment to the CHA as to both plaintiffs' claims under Tenn. Code Ann. § 4-21-301.

VI.

The judgment of the trial court is vacated in part and affirmed in part. Exercising our discretion, we tax the costs on appeal against the Chattanooga Housing Authority. This case is remanded to the trial court for further proceedings, consistent with this opinion.

_____
CHARLES D. SUSANO, JR., JUDGE